# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

DARLENE ANDRADE, CHRISTINA
CANDELARIA, CYNTHIA RAMONA
CHAVEZ, MONICA RENEE CHAVEZ,
NAOMI GRIEGO, AND KIMBERLY
SCHREPFER,

        Plaintiffs,

vs.                                                   Case No. 1:19-cv-1144 KWR/JFR

BOARD OF COUNTY COMMISSIONERS
OF THE COUNTY OF BERNALILLO;
SERGEANT JASON ROLSTON, in his
individual capacity; and SERGEANT JAMES
BRANDON, in his individual capacity,

        Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon Defendants' Motion for Summary Judgment based on qualified immunity, filed on February 12, 2020 (**Doc. 11**). Having reviewed the parties' pleadings and the applicable law, the Court finds that Defendants' motion is well-taken and, therefore, is **GRANTED** with respect to Plaintiffs' Count V, Fourteenth Amendment excessive force claim. Because the only remaining claims after the Court dismisses Count V are state-law claims, the Court declines to continue to exercise supplemental jurisdiction and will remand those claims to state court.

## BACKGROUND

This case arises from an incident at the Bernalillo County Metropolitan Detention Center (MDC) in which two corrections officers deployed their MK-9 foggers (pepper spray/mace)

1

against Plaintiffs. Plaintiffs allege that Defendants used excessive force by spraying Plaintiffs with mace while Plaintiff Cynthia Chavez (Chavez) having a seizure.

Plaintiffs filed this case under 42 U.S.C. § 1983 and the New Mexico Tort Claims Act, alleging the following claims against the Defendants:

Count I:  Battery

Count II:  Negligence Resulting in Battery

Count III:  Excessive Force (Pursuant to the New Mexico Constitution)

Count IV:  Negligence Resulting in Excessive Force (Pursuant to the New Mexico Constitution); and

Count V: Excessive Force (Fourteenth Amendment U.S. Constitution)

## LEGAL STANDARD

The Board of County Commissioners of the County of Bernalillo (The Board of County Commissioners), Jason Rolston (Rolston), and James Brandon (Brandon) (collectively Defendants) have asserted the defense of qualified immunity, which shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Romero v. Story*, 672 F.3d 880 (10th Cir. 2012).

When a defendant moves for summary judgment on the basis of qualified immunity, the plaintiff bears a heavy two-fold burden. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must put forward evidence showing (1) that the defendant violated plaintiff's constitutional rights, and (2) the right at issue was clearly established at the time of the violation. *Id*. If the plaintiff fails to establish either part of the two-part inquiry, the court must grant the defendants qualified immunity. *Id.* If the plaintiff meets his or her burden of coming forward with facts or allegations which would demonstrate that the defendant's alleged violation should have

been apparent in light of preexisting law, then the defendant assumes the normal summary judgment burden of establishing that no material facts remain in dispute that would defeat its claim of qualified immunity. *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992). In determining whether summary judgment is appropriate, the Court considers the facts and all reasonable inferences drawn therefrom in a light most favorable to the nonmoving party. *Hollander v. Sandoz Pharmaceuticals Corp.*, 289 F.3d 1193, 1214 (10th Cir. 2002).

## UNDISPUTED MATERIAL FACTS[1]

### Factual Background

On March 20, 2017, Plaintiffs were pretrial detainees held at MDC. Plaintiffs had been subject to a lockdown for several days while MDC officials searched detainees' cells for a set of lost laundry keys. Between 7:00 p.m.-9:00 p.m., MDC personnel conducted a shakedown of Plaintiffs' housing pod. Plaintiffs were sent outside to the adjacent courtyard while MDC continued searching the unit. Based on inmate classification and history, Rolston did not deem it necessary to post an officer in the courtyard during the search. Accordingly, no corrections officers were watching the inmates in the courtyard at the time the incident occurred.

It is undisputed that the surveillance video captures the entirety of the incident. The Court therefore provides a description of what the video depicts, with a discussion regarding Plaintiffs' argument that the video footage should be construed as depicting more than the following.[2]

---

[1] The facts set forth in this section are undisputed or taken in the light most favorable to Plaintiffs unless otherwise noted. The Court has reviewed the relevant video surveillance tape upon which both parties rely and incorporates factual information therefrom. References to supporting exhibits are included in the briefs and for ease of reading, are omitted here.

[2] The Court relays here only what is indisputably shown by the video, and therefore necessary to take as a matter of fact. *Scott v. Harris*, 550 U.S. 372, 378–81 (2007) (holding that where a video depicts facts in such a clear manner so that "no reasonable jury" could have believed an alternative story, then the court must "view[] the facts in the light depicted by the videotape").

The video shows, in mute footage, the courtyard in which the detainees have been sent while MDC officers search the pod. In the backdrop the camera captures the windows into the unit, which can be hazily seen into. Initially, only a few detainees are visible. By herself in the forefront, one detainee, identified as Chavez, can be seen milling about with a towel across her shoulders.[3] As the video progresses, Chavez bends over, lowering herself to the ground in a seated position while placing the towel over her head. As she folds forward further on the ground, another inmate, identified as Chavez's cellmate Kimberly Schrepfer (Schrepfer) runs over, touches Chavez briefly and then sits down behind her, pulling Chavez's head backward into her lap. Chavez then appears to begin seizing violently.

The relevant events unfold in a matter of seconds. As Chavez begins seizing in Schrepfer's arms, two inmates exit the unit door behind them. It is undisputed that one of those inmates went back into the pod to request officers call a code for medical assistance. The video depicts one of them turning around and reentering the building. At the same time, Plaintiffs Darlene Andrade (Andrade) and Christina Candelaria (Candelaria), approach Chavez as she continues to convulse, "flopping around like a fish." It is undisputed that Schrepfer attempted to secure Chavez's head between her legs while Andrade and Candelaria tried to hold Chavez's legs down. Several other detainees rapidly converge upon the individuals on the ground. At the same time, through the windows and open door in which two inmates are standing, multiple MDC officials, with Brandon and Rolston in the lead, can be seen rushing toward the door.

The inmates in the door make way for the officers, three of whom emerge first to reach the group. As the officers enter the courtyard some of the surrounding inmates begin to back away slowly. Nearly simultaneously, Brandon and Rolston draw and spray their MK-9 foggers,

---

[3] The record indicates that the detainees were instructed to take one towel each upon leaving their cells during the search.

enveloping the inmates on the ground, causing the surrounding detainees to retreat rapidly. Andrade and Candelaria also move away, one backing away quickly on her feet with her hands raised while the other crawls away slowly. The video captures several other inmates milling around the courtyard holding towels to their faces. Only Chavez and Schrepfer remain on the ground at the officers' feet. After a few moments, more officers approach and eventually Schrepfer is helped to her feet and walked into the building. Chavez remains on the ground for several minutes as officers and medical personnel render aid. She appears to seize further during the ensuing interaction. After the incident, none of the inmates were written up for a fight.

### **Factual Disputes**

Having outlined the indisputable content portrayed by the video, the Court turns to the parties' factual disputes.

### **Whether a Code was Called**

Defendants contend that a fight code (Code 32) was mistakenly called (by Rolston) instead of a medical one, leading officers to believe that there was a fight in the courtyard. Specifically, Rolston and Brandon testified that while they were searching the inside of a cell, they heard a female voice say "fight." Citing to Rolston's deposition, Plaintiffs dispute that Rolston called a Code 32 after hearing a female inmate yell "fight." However, nothing in his deposition supports that the officers did not hear someone call out "fight." In further support of their contention, Plaintiffs cite to page 34 of Exhibit H, "the May 2017 Final Report," which appears to be an internal investigation into the incident. The Report includes the following:

> Sgt. Rolston maintained he called a "Code-32" over the radio as soon as he heard the inmate yell fight and saw three inmates on the ground wrestling. The MCC log does not list a Code-32. The radio transmissions provided by BCSO Communications do not contain a Code-32 or a Code-43. Testimony from the MCC Officers (Taddy, Sanchez, and Herrera) heard a code called but they did not

5

> understand what it was or where it was. C/O Hill-King testified she was in MCC and she heard the Code-32, but she did not hear which pod it was coming from… Sgt. Rolston, Sgt. Brandon, C/O Reyes, and C/O Standiford all maintain they heard an inmate yell "fight" and none of them heard the word seizure until after the OC [mace] had been deployed.

Having reviewed the record cited to by Plaintiffs in support, the Court finds Plaintiffs' evidence insufficient to hold that Defendants did not hear someone call out fight, or that Rolston did not call a fight code.

Defendants next contend that, believing a fight was occurring in the courtyard, Rolston and Brandon rushed outside to what appeared to them as fighting; three detainees holding down a fourth as she struggled on the ground. Plaintiffs dispute this fact, arguing that "In the light most favorable to Plaintiffs, the facts and those captured on video indicate a medical emergency and not a fight," and that the residents do not appear to be fighting. Doc. 19 at 8. The Court disagrees; that is Plaintiffs' conclusory, subjective interpretation of the video content, which on its face does not dictate such a conclusion.

### Whether Defendants Were Aware that Chavez Suffered from Seizures

Plaintiffs contend that MDC personnel were aware that Chavez suffered from seizures. Defendants dispute this fact and claim that neither Rolston nor Brandon were aware of Chavez's seizures prior to the incident at issue. The Court notes that Plaintiffs' evidence does not speak to these two officers specifically, and as such Plaintiffs have failed to establish that Rolston and Brandon knew of Chavez's history of seizures. Although also disputed and despite the fact that not all the evidence Plaintiffs cite to supports their contention, viewing the facts in the light most favorable to Plaintiffs, the Court will accept as true that some MDC personnel were aware that Chavez suffered from seizures.

### Whether the Officers Issued any Commands Prior to Using Mace

Defendants assert that prior to using their MK-9 foggers, Brandon issued a command to the inmates to stop fighting and release Chavez, and that Plaintiffs did not comply with his directive. Plaintiffs claim that no such order was issued, citing to Candelaria's Deposition where she stated that she did not recall any corrections officers issuing any orders to stop fighting before they used mace. Doc. 19-3 Ex. C, 24:20-25. The Court notes that her recollection is contradicted by Brandon and Rolston, as well as Schrepfer, who testified that when the officers emerged from the unit, "they started yelling at me leave her alone, leave her alone." Doc. 11-1 Ex. A, 29:20-25. Furthermore, in her deposition, Andrade also stated that "when [the officers] came out and they were fog  - when they were spraying us, they told us to let go of her. And we said, "We are not going to let go of her…" Doc. 11-3 Ex. B, 24:23-25. While Plaintiffs' version of this fact therefore appears tenuous and unsupported by the majority of the record, for the purpose of qualified immunity the Court will nevertheless accept their assertion that no order was issued, as it is possible a jury could believe them. *See Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018).

### **Whether Defendants Believed There was a Fight**

Plaintiffs dispute Defendants' claim that they mistakenly believed there was a fight in the courtyard and that they only realized Chavez was having a seizure after deploying their foggers "as they had ample time to assess reality."   Plaintiffs cite solely to the video in support of their argument. Having observed the video, the Court rejects Plaintiffs' conclusory argument. The timing of the incident, from Chavez's initial seizure to the deployment of the foggers, takes place over a matter of seconds, thus the Court finds Plaintiffs' claim that there was ample time to assess the situation as without support in the record.  Contrary to Plaintiffs' argument, citation to the video alone is also insufficient to support the contention that Defendants could not have believed a fight was occurring.

**Plaintiffs' Additional Facts**

Plaintiffs advance a series of "Additional Undisputed Material Facts." Preliminarily, Plaintiffs relay a series of facts relating to the process of identifying inmates who must be kept away from one another due to the threat that they will fight. Plaintiffs provide that such inmates are recorded in MDC's computer system and are not permitted to be housed in the same pods. The Court agrees with Defendants that these facts are irrelevant to the Court's determination, as establishing that inmates are designated in such a manner does not mean that they would not or could not fight on any occasion. With respect to the remainder of Plaintiffs' assertions the Court notes that it is undisputed that other MDC inmates were aware that Chavez suffered from seizures; that seizures were a fairly common occurrence at MDC; that Schrepfer was tasked with helping Chavez when she suffered a seizure; and that Rolston and Brandon administered medical aid to Chavez after deploying their MK-9 foggers.

## DISCUSSION

### I. Constitutional Claims against Defendants.

#### A. Qualified Immunity Standard.

Defendants have asserted the defense of qualified immunity, which shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Romero v. Story*, 672 F.3d at 880.

Plaintiffs carry a heavy two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct. *Davis v. Clifford*, 825 F.3d 1131, 1135 (10th Cir. 2016). For a violation to be clearly established, "there must be a Supreme Court or Tenth Circuit decision

8

on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Mocek v. City of Albuquerque*, 813 F.3d 912, 922 (10th Cir. 2015) (quoting *Morris v. Noe,* 672 F.3d 1185, 1196 (10th Cir.2012)). A case need not be directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law" (*Mullenix v. Luna*, ––– U.S. –––, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs,* 475 U.S. 335 (1986)), and is intended to give officials "breathing room to make reasonable but mistaken judgments." *Kapinski v. City of Albuquerque*, 2020 WL 3635094, at *4 (10th Cir. July 6, 2020) (*quoting Stanton v. Sims*, 571 U.S. 3, 6 (2013)).

The Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223 at 236 . "In determining whether the plaintiff meets the requisite burden, [the Court] ordinarily accept[s] the plaintiff's version of the facts—that is, the facts alleged." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (quotation marks omitted). Therefore, the Court first considers whether, viewed in the light most favorable to Plaintiffs, Defendants' conduct violated their constitutional rights subject to the Fourteenth Amendment. With respect to Count V, the Court concludes that Defendants did not.

### B.     **Plaintiffs' Excessive Force Claim**

Pretrial detainees are protected under the Due Process Clause of the Fourteenth Amendment. *See Bell v. Wolfish,* 441 U.S. 520, 535 n. 16 (1979). Plaintiffs contend that Defendants violated their Fourteenth Amendment rights by unlawfully deploying the MK-9 foggers on March 20, 2017 as Schrepfer, Andrade and Candelaria sought to render aid to Chavez

9

while she was having a seizure. Defendants argue that their use of the foggers did not violate a constitutional right because their actions were objectively reasonable, having mistakenly believed a fight was occurring, and that even if there was a constitutional violation the law was not clearly established at the time that the use of pepper spray under the circumstances constituted excessive force in violation of the Fourteenth Amendment. Specifically, Defendants claim that a fight code was mistakenly called and that upon viewing the inmates struggling on the ground, the corrections officers sought to break up what they reasonably presumed was a fight.

### The Law Regarding Excessive Force Pursuant to the Fourteenth Amendment

The Supreme Court has provided that the standard of review of excessive force claims brought by pretrial detainees under the Fourteenth Amendment is one of objective reasonableness. *Shaw v. Granvil*, 2016 WL 10267676, at *4 (D.N.M. May 23, 2016). In *Kingsley v. Hendrickson* (576 U.S. 389, 397, 135 S. Ct. 2466, 2473 (2015)) the Court explained the appropriate application of the standard:

> A court (judge or jury) cannot apply this standard mechanically. See *Lewis, supra,* at 850, 118 S.Ct. 1708. Rather, objective reasonableness turns on the "facts and circumstances of each particular case." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. See *ibid*. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 540, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

To determine the reasonableness or unreasonableness of the force used, the *Kingsley* Court adopted factors advanced in *Graham v. Connor* (490 U.S. 386, 396, 109 S.Ct. 1865 (1989)), a case involving excessive force during an investigatory stop:

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use

10

>of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. See, *e.g., Graham, supra,* at 396, 109 S.Ct. 1865. *We do not consider this list to be exclusive. We mention these factors only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force.*

*Kingsley*, 576 U.S. at 397 (emphasis added).

Furthermore, recognizing the "inordinately difficult undertaking" of running a prison, the United States Supreme Court held that use of the objective standard protects officers acting in good faith. *Id.* at 399. The Supreme Court continued, explaining:

>"[S]afety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face," *Florence v. Board of Chosen Freeholders of County of Burlington,* 566 U.S. ——, ——, 132 S.Ct. 1510, 1515, 182 L.Ed.2d 566 (2012). Officers facing disturbances "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham,* 490 U.S., at 397, 109 S.Ct. 1865. For these reasons, we have stressed that a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer.

*Id*.

Accordingly, in the instant action the Court considers whether Defendants' use of mace was objectively reasonable from the perspective of a reasonable officer confronted with the incident at hand.

### C. <u>Defendants' Conduct was Objectively Reasonable</u>

Plaintiffs initially argue that the Court must construe the video as showing that Defendants sprayed Plaintiffs during a medical emergency and not during a fight, and that therefore the *Kingsley* factors all weigh in Plaintiffs' favor. The Court disagrees. Even assuming Plaintiffs' version of the facts that are well-supported by the record are true, Plaintiffs have failed to demonstrate a violation of the Fourteenth Amendment with respect to Defendants' use of mace because Defendants' actions were objectively reasonable.

Here, the critical events took place over a matter of seconds. The record supports that Rolston and Brandon responded to a disturbance in the courtyard, which they reasonably, albeit mistakenly believed to be a fight. While Plaintiffs insist that no fight code was called because it was not recorded by the MDC master control[4], the evidence they cite to in the record supports the opposite conclusion.[5] Defendants' testimony claims, and the video evidence corroborates, that upon exiting the building, Defendants observed an inmate flailing on the ground while being forcibly restrained in the head/neck area and by the legs by three other inmates, as several more detainees rapidly converged on the struggling group. Thus, the Court concludes that a reasonable officer presented with these facts could presume a fight had broken out.

Applying some of the factors advanced in *Kingsley*, reasonably perceiving a fight, the use of mace to separate the inmates was reasonable; the amount of force used in deploying the foggers was reasonable; the extent of the injuries inflicted, while lamentable, was not excessive; and the mace was applied in a good faith effort to restore order and was not used "maliciously and sadistically for the very purpose of causing harm." *Kingsley*, 576 U.S. at 401–02. Noting that the reasonableness of Defendants' conduct must be assessed "from the perspective of a reasonable officer on the scene," and recognizing the fact that the officer may be "forced to make split-second judgments" under stressful and dangerous conditions (*Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)), the Court concludes that under the circumstances present and the information available to Defendants at the time, the use of the foggers, while ultimately regrettable, was objectively reasonable. Furthermore, to the extent

---

[4] The record indicates that it is MDC policy that all codes are logged by Master Control. *See* Doc. 19-7 Ex. G, 44:6-14.

[5] Plaintiff cite to Ex. H, an internal affairs investigative report. However, the report states that multiple officers heard a code called but "did not understand what it was or where it was. C/O Hill-King testified she was in MCC and she heard the Code-32, but she did not hear which pod it was coming from."

that Plaintiffs assert municipal liability against The Board of County Commissioners with respect to Count V, this precludes a finding of liability. *See Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers."). Accordingly, Defendants' motion for summary judgment as to Count V is **GRANTED.**

### D.      A Constitutional Violation was Not Clearly Established.

Alternatively, even accepting Plaintiffs' version of the facts (well-pleaded and with citations to the record) as true, and assuming *arguendo* that they demonstrated a constitutional violation, Plaintiffs also failed to satisfy their burden on the clearly established prong of qualified immunity.

### Law Regarding a Clearly Established Constitutional Violation

 "The law is clearly established if there is a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, that has found the law to be as the plaintiff maintains." *Gadd v. Campbell*, 2017 WL 4857429, at *4 (10th Cir. 2017).  "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, ––– U.S. ––––, 136 S.Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted). "Clearly established law should not be defined at a high level of generality." *White v. Pauly*, ––– U.S. ––––, 137 S.Ct. 548, 552 (2017) (internal quotation marks omitted).  Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* "The Tenth Circuit has adopted "a sliding scale to determine when law is clearly established. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.' " *Youngquist v. Bd. of*

*County Commissioners for Curry County, New Mexico*, 2016 WL 9725196, at *4 (D.N.M. Dec. 13, 2016).

Plaintiffs bear the burden of citing to case law and articulating the clearly established right they claim has been violated. *See Thomas v. Durastanti,* 607 F.3d 655, 669 (10th Cir. 2010); *Martinez v. Carr*, 479 F.3d 1292, 1295 (10th Cir. 2007) ("[T]he record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." (internal quotation marks omitted)). In analyzing clearly established law, the Court looks at the cases cited by Plaintiffs to determine whether those cases can serve as clearly established law. *See, e.g., A.M. v. Holmes*, 830 F.3d 1123, 1154 (10th Cir. 2016) (granting qualified immunity where "neither of Plaintiff's cited sources can serve as the clearly established law governing this First Amendment retaliation claim.").

To satisfy their burden of citing to clearly established law, Plaintiffs rely predominantly upon three cases: *Martinez v. New Mexico Dept. of Pub. Safety*, 47 Fed. Appx. 513 (10th Cir. 2002); *DeSpain v. Uphoff*, 264 F.3d 965 (10th Cir. 2001); and *McKinney v. Lexington–Fayette Urban County Gov't*, 651 Fed. Appx. 449 (6th Cir. 2016). Specifically, Plaintiffs assert that the law is clearly established that "even absent any factually similar case, it is clearly excessive to use pepper spray on an individual who is under control and rendered helpless; The Tenth Circuit 'will not require inmates to be subjected to the malicious whims of prison guards'; and Officers responding to a medical emergency are not permitted to use any force, even to overcome defensive resistance, much less no resistance at all." Doc. 19 at 18. Although these cases set forth principles generally applicable to excessive force against inmates at varying stages of the judicial process[6], the cases are not analogous to the instant action and thus inapposite.

---

[6] The cases Plaintiffs cite are advanced under different Amendments (Fourth and Eighth) dependent upon the respective stage in the judicial process.

**The Martinez Case**

In *Martinez*, the plaintiff was arrested by a state trooper during a traffic stop for speeding. *Martinez*, 47 Fed. Appx. at 514. Plaintiff presented a defaced license, after which the trooper was advised by dispatch that there was a warrant out for an individual with plaintiff's name and date of birth. *Id*. When the trooper ordered the plaintiff out of her car, she refused, demanding to see his identification.[7] Eventually the plaintiff accompanied the officer to his vehicle, where he placed her under arrest and handcuffed her. *Id*. at 515. However, the plaintiff verbally refused to comply with the trooper's directive to get into the back of the cruiser and continued to request the officer produce identification. After warning plaintiff that he would have to "mace" her if she continued to refuse to get into the vehicle, the trooper maced her, after which she complied. *Id*.

Plaintiff subsequently brought an action for excessive force in violation of her Fourth Amendment rights. In denying qualified immunity, the Court found that the crime at issue was of "minor severity"; the plaintiff was not actively resisting or attempting to flee; and at the time she was maced, plaintiff was handcuffed and standing behind the officer's vehicle, and did not present a threat to the officer. *Id*. at 515-16. The Court concluded, "Thus, no 'stressful and dangerous condition[ ]' existed and Trooper Boyd was not forced into a position where he had to make a 'split-second judgment' of how to deal with the situation." *Id*. at 516. The Court found that a reasonable officer could have de-escalated the situation by simply providing identification, and that a reasonable officer would have clearly understood that use of mace under the circumstances would be excessive. *Id*. at 517.

*Martinez* is inapposite to the instant action. In *Martinez*, the trooper had sufficient time to assess and the opportunity to defuse the situation. There was no need for a "split-second judgment"

---

[7] The trooper was in full uniform and driving a standard police vehicle.

and the facts did not present any unduly stressful condition. In contrast, here, as the video evidence portrays, the Defendants responded in a matter of seconds to what they reasonably perceived as four inmates struggling on the ground while others rapidly converged on the group. As such, *Martinez* is not analogous and does not support that the law was clearly established under the particular circumstances of the instant action.

### *Despain* is Distinguishable

Plaintiffs next cite to *Despain* for the proposition that "The Tenth Circuit will not require inmates to be subjected to the malicious whims of prison guards." Doc. 19 at 18. The Court agrees but finds this rule inapplicable to the matter at hand. In *Despain*, the plaintiff asserted an Eighth Amendment excessive force claim when, among other things, an officer "indiscriminately" sprayed a canister of pepper spray along a prison tier. *DeSpain*, 264 F.3d at 977. Plaintiff alleged that the officer discharged the mace as "an act of humor" and was seen laughing after the incident. *Id.* Accepting plaintiff's version of the facts as true, the Court determined that the act was deliberate and carried out as a joke. On this basis, the Court considered several factors[8] to assess reasonableness, and determined that the officer's conduct was not a good faith effort to restore order on the prison tier; was unwarranted; and was carried out maliciously and sadistically for the purpose of causing harm. *Id*. at 978-80.

For the reasons stated in the Court's discussion of *Martinez*, this case is also not analogous to the instant action. *Despain* does not support that it would be clear to a reasonable officer, under the circumstances presented in the instant action, that his conduct was unlawful, particularly because Defendants mistakenly believed there was a fight in the courtyard. *See Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) ("The protection of qualified immunity applies

---

[8] The factors considered were similar to those provided in *Kingsley*.

16

regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.").

### **The McKinney Case is Inapposite**

Relying upon *McKinney*, Plaintiffs state generally that "Officers responding to a medical emergency are not permitted to use any force, even to overcome defensive resistance, much less no resistance at all." Doc. 19 at 18. In *McKinney*, officers utilized mace and pressure point control techniques to forcibly restrain an inmate while he was seizing violently. *McKinney*, 651 Fed. Appx. at 451-452. A camera captured the events, which took place over several minutes and involved multiple officers. *Id.* at 453. The officers eventually secured the plaintiff to a restraint chair and placed a spit hood over his face. *Id.* at 452-53. Plaintiff continued to demonstrate agitation and convulsions, rocking his head from side to side and spitting up blood. Medical personnel administered Ativan, a medication designed to calm seizing patients and prevent additional seizures. *Id*. at 454. Plaintiff repeatedly stated "please" and "help" after the Ativan injection. *Id*. Plaintiff was then moved to a bed on the floor as officers unshackled him and removed him from the restraint chair. *Id*. After being placed in a recovery position, he became non-responsive and appeared to cease breathing. *Id*. at 454-55. The plaintiff was subsequently transported to a hospital and pronounced dead.

Similarly to *Martinez* and *Despain*, the facts of *McKinney* substantially differ from the instant action. In *McKinney*, there was ample time to assess the situation and alter course; it was abundantly clear that plaintiff was having a seizure; no other inmates were involved; the defendants utilized significant force over several minutes to subdue the plaintiff; and allegedly adopted improper techniques in placing him in a recovery position. Here, Rolston and Brandon responded simultaneously to what appeared to be a fight; deployed short blasts of mace and ceased as soon

as the inmates dispersed and it became clear that Chavez was seizing. Therefore, Plaintiffs have failed to put forward factually analogous precedent to overcome the clearly established prong of qualified immunity. Accordingly, Defendants' motion for summary judgment on the basis of qualified immunity, as to Count V, is granted.

### The Court Declines to Exercise Jurisdiction over Plaintiffs' Remaining Claims

This Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The Court "may decline to exercise supplemental jurisdiction over a claim" under § 1367(a) if the Court "has dismissed all claims over which it has original jurisdiction." § 1367(c)(3). "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011). The Court has discretion to decide *sua sponte* whether to exercise supplemental jurisdiction over remaining state law claims. *See Ames v. Miller*, 247 Fed. Appx. 131, 133-35 (10th Cir. 2007) (unpublished) (affirming court's sua sponte decisions to dismiss and to decline supplemental jurisdiction over state law claims). In dismissing state law claims for lack of supplemental jurisdiction, the Court weighs the following factors: judicial economy, convenience, fairness, and comity. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  In the usual case, this will point toward dismissal.  *Id.*

Here, having dismissed Plaintiffs' federal claim in Count V, and having conducted the relevant factorial analysis, the Court declines to exercise jurisdiction over the remaining state law claims.

**CONCLUSION**

For the reasons stated above, Plaintiffs' Count V asserted against Defendants is dismissed. Having disposed of Plaintiffs' federal claim, the Court declines to exercise supplemental jurisdiction to consider the claims contained in Counts I-IV and will instead remand to state court.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment **(Doc. 11),** with respect to Count V, is **GRANTED**.

**IT IS FURTHER ORDERED** that that the Court declines to exercise supplemental jurisdiction over the remaining state law claims (Counts I-IV).

**IT IS FURTHER ORDERED** that this action is **REMANDED** to the Second Judicial District Court, Bernalillo County, New Mexico.  The Clerk of Court is hereby directed to take the necessary actions to remand the case.

_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE